UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JAMES BUMPUS,


                                    Plaintiff,

                                                        DECISION AND ORDER

                                                        05-CV-6001L


                        v.

WESLEY K. CANFIELD, et al.,


                                    Defendant.
_____


      Plaintiff James Bumpus, appearing *pro se*, commenced this action under 42 U.S.C. § 1983. Plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), alleges that defendants, all of whom at all relevant times were officials or employees of DOCS, have violated his constitutional rights in connection with plaintiff's medical care and treatment while he was confined at the Elmira Correctional Facility ("Elmira") from 2004 to 2005. Defendants have moved for summary judgment.

      Most of plaintiff's claims arise out of the treatment plaintiff received for a host of medical conditions including hypertension, renal failure of the right kidney, hepatitis C, renal cell cancer, recurrent urinary tract infections, and left heart dysfunction, from about May 2004 to August 2005. Plaintiff alleges that defendants Wesley Canfield, M.D., Correctional Officers ("C.O.") Michael Riddle, and Richard Scott, and Nurse Marijon Hopkins violated his rights under the Eighth

Amendment to the United States Constitution by acting with deliberate indifference to his medical needs.

Plaintiff also asserts  claims against Correctional Sergeant Ballachino and C.O. Gary Materne.  Plaintiff alleges that Ballachino retaliated against him for writing letters to DOCS officials, and for filing grievances, complaining about various matters.  Plaintiff alleges that Materne deliberately denied him access to the Inmate Grievance Resolution Committee ("IGRC").


**DISCUSSION**


**I. Summary Judgment Standard**

Rule 56(c) provides that a moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).  The Court's role in determining a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id*. When considering a motion for summary judgment, the Court must draw inferences from underlying facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

Once the moving party satisfies his initial burden under Rule 56(c) of demonstrating the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).  Otherwise stated, "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.  A genuine issue of material fact exists only if the record, taken as a whole, could lead a reasonable trier of fact to find in favor of the non-moving party. *Matsushita*, 475 U.S. at 587.

Where the party opposing summary judgment is proceeding *pro se*, the Court must "read the pleadings ... liberally and interpret them to raise the strongest arguments that they suggest." *Corcoran v. New York Power Auth.*, 202 F.3d 530, 536 (2$^d$ Cir. 1999).  Nevertheless, "proceeding *pro se* does not otherwise relieve [opposing party] from the usual requirements of summary judgment." *Fitzpatrick v. N.Y. Cornell Hosp.*, No. 00-Civ.-8594, 2002 U.S. Dist. LEXIS 25166, at *5 (S.D.N.Y. Jan. 9, 2003); *see also Stinson v. Sheriff's Dep't of Sullivan County*, 499 F.Supp. 259, 262 (S.D.N.Y. 1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

## II. Eighth Amendment Claims:  General Principles

To show that prison medical treatment was so inadequate as to amount to "cruel and unusual punishment" prohibited by the Eighth Amendment, plaintiff must prove that defendant's actions or omissions amounted to "deliberate indifference to a serious medical need." *Estelle v. Gamble,* 429

U.S. 97, 106 (1976).  To establish such a claim, then, the prisoner must prove (1) the existence of a serious medical need and (2) defendants' deliberate indifference to that need.

The Second Circuit has stated that a medical need is "serious" for constitutional purposes if it presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'" *Chance v. Armstrong,* 143 F.3d 698, 702 (2$^d$ Cir. 1998) (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2$^d$ Cir. 1994), *cert. denied,* 513 U.S. 1154 (1995)).  Among the relevant factors for determining whether a serious medical need exists are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance*, 143 F.3d at 702 (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997)).

"[W]here the prisoner is receiving appropriate on-going treatment for his condition, but ... brings a ... denial of medical care claim based on a temporary delay or interruption in treatment," the Second Circuit has explained that the "serious medical need inquiry can properly take into account the severity of the temporary deprivation alleged by the prisoner." *Smith v. Carpenter*, 316 F.3d 178, 186 (2$^d$ Cir. 2003) (footnote omitted).  The court in *Smith* added that "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Id.*  Nevertheless, the court added, significant "risks may be absent ... where the alleged lapses in treatment are minor and inconsequential," *id.*, and that "in most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the

question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Id.* at 187.

The "deliberate indifference" component, as explained by the Supreme Court, includes both an objective and subjective element. *Wilson v. Seiter,* 501 U.S. 294, 298-299 (1991). With respect to the objective aspect, the court must ask whether there has been a sufficiently serious deprivation of the prisoner's constitutional rights. *Id.* "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* at 298 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Thus, Eighth Amendment protection is limited to "a condition of urgency that may result in degeneration or extreme pain." *Chance*, 143 F.3d at 702.

With respect to the subjective aspect, the court must consider whether the deprivation was brought about by defendants in wanton disregard of those rights. *Wilson*, 501 U.S. at 298-99. To establish indifference of a constitutional magnitude, plaintiff must prove that the defendants had a culpable state of mind and intended wantonly to inflict pain. *See id.* at 299; *DesRosier v. Moran*, 949 F.2d 15, 19 (1st Cir. 1991); *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir.), *cert. denied*, 506 U.S. 1040 (1992).

The Court in *Estelle* also cautioned that mere negligence is not actionable. "A [prisoner's] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eight Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. Rather, the plaintiff must allege conduct that is "repugnant to the conscience of mankind," *id.*

- 5 -

at 102, or "incompatible with the evolving standards of decency that mark the progress of a maturing society," *id.* at 105-06.   It is clear, then, that allegations of malpractice alone do not state a constitutional claim.   *Id.* at 106 n. 14; *Chance*, 143 F.3d at 703-04; *Ross*, 784 F. Supp. at 44.

Likewise, an inmate's "mere disagreement over the proper treatment does not create a constitutional claim.   So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."   *Chance*, 143 F.3d at 703; *see also Bowring v. Godwin*, 551 F.2d 44, 48 (4ᵗʰ Cir. 1977) ("The courts will not intervene upon allegations of mere negligence, mistake or difference of opinion").

Finally, as with all claims under § 1983, the plaintiff must establish the defendant's personal involvement in the alleged constitutional deprivation.   *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2ᵈ Cir. 2001); *Gaston v. Coughlin*, 249 F.3d 156, 164 (2ᵈ Cir. 2001).   A supervisory official's personal involvement may be shown by evidence that:  (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to others' rights by failing to act on information indicating that unconstitutional acts were occurring.   *Colon v. Coughlin*, 58 F.3d 865, 873 (2ᵈ Cir. 1995); *Williams v. Smith*, 781 F.2d 319, 323-24 (2ᵈ Cir. 1986).

**III. Application to this Case**

**A. Claim Against Dr. Canfield**

Plaintiff alleges that Canfield was deliberately indifferent to his serious medical needs by failing to timely refill plaintiff's medications and by "depart[ing] from good and acceptable medical practice." (Dkt. #1 at 6.)  Plaintiff alleges that Canfield failed to respond to letters plaintiff sent to him explaining the problems that he had been having concerning refilling prescriptions and the symptoms that he had been experiencing.  (Dkt. #1 at 4, 6.)  Plaintiff further alleges that as a result of "the non-medical treatment ...and the delay in providing plaintiff with prescribed hypertension medications," he now suffers from ongoing medical problems including diabetes.  (Dkt. #50 at 3.)

The record indicates, and defendants do not appear to dispute, that on one occasion there was a delay of several days in dispensing plaintiff's hypertension medication, although the reasons for this delay are unclear.  *See* Canfield Decl. (Dkt. #43) ¶¶ 16-19.  That factual matter is immaterial, however, and does not preclude the entry of summary judgment for defendants, because there is no evidence that this delay caused any actual harm to plaintiff, or that the delay gave rise to a significant risk of serious harm.  *See Salahuddin v. Goord*, 467 F.3d 263, 281 (2$^d$ Cir. 2006) (immaterial factual disputes cannot defeat a motion for summary judgment) (citing *Celotex*, 477 U.S. at 322-32).

In the case at bar, plaintiff offers no evidence supporting his conclusory allegations that any delay in his receipt of medication, or anything that Dr. Canfield did or did not do in treating plaintiff, caused plaintiff's health to suffer, or that it created a significant risk of serious harm.  *See Smith, supra,* at 186-87.  In that regard, Canfield has submitted a declaration stating that plaintiff's medical records do not indicate that plaintiff experienced any complications during the time that he was

waiting for his prescription to be refilled (Dkt. #43 at 4.)[1]  Plaintiff has submitted no evidence

indicating that this relatively brief delay posed a significant risk to his health.   Plaintiff has thus

failed to demonstrate the existence of any genuine issue of fact concerning the objective prong of

the Eighth Amendment claim.

Even if plaintiff could make such a showing, however, Canfield would be entitled to

summary judgment, since there is no evidence that he acted with the requisite culpable state of mind.

In fact, plaintiff himself testified at his deposition that he "do[es]n't think [Canfield] was deliberately

trying to hurt" plaintiff.  (Dkt. #42, Ex. A at 70.)  Plaintiff's claim against Dr. Canfield must

therefore be dismissed.


**B. Claim Against Nurse Hopkins**

Plaintiff claims that Nurse Hopkins, who plaintiff alleges was a nurse administrator at

Elmira, was deliberately indifferent to his serious medical needs through her failure to intervene and

ensure that plaintiff was receiving proper medical care.  This claim must also be dismissed.

The record is devoid of evidence establishing that Nurse Hopkins was personally involved

in plaintiff's medical treatment beyond plaintiff's deposition testimony that he "wrote her several

letters complaining" about his perceived lack of medical attention, and that she did not respond.

(Dkt. 42, Ex. A at 63.)  That is not enough to establish Hopkins's personal involvement in the

alleged violations. *See Brooks v. Chappius*, 450 F.Supp.2d 220, 226 (W.D.N.Y. 2006) ("Even 'the

fact that an official ignored a letter alleging unconstitutional conduct is not enough to establish

---

[1] Plaintiff gained seventy pounds from November 2003 to April 2005.  (Dkt. #43 at 6.)

personal involvement'") (quoting *Thomas v. Coombe*, No. 95 Civ. 10342, 1998 WL 391143, at *6 (S.D.N.Y. July 13, 1998)).

Even if plaintiff could show that Hopkins was personally involved, however, there is no evidence that she had the requisite state of mind to act with deliberate indifference to plaintiff's serious medical needs.  In fact, when plaintiff was asked at his deposition, whether he "believe[d] that [Hopkins] was deliberately trying to hurt" him, plaintiff replied, "No, no.  I don't believe that. I don't think she was deliberately trying to hurt me," and that "she always tried to help me."  (Dkt. #42, Ex. A at 78-79.)

Plaintiff's claim against Hopkins appears to rest mostly on her supervisory status.  The mere fact that Nurse Hopkins was a supervisor at the time of the events in question is not enough to give rise to § 1983 liability, however, since the doctrine of respondeat superior does not apply to § 1983 cases.  *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065 (2$^d$ Cir. 1989); *Graham v. Poole*, 476 F.Supp.2d 257, 261 (W.D.N.Y. 2007).   Plaintiff's conclusory allegation that Hopkins "was specifically informed of the plaintiff's on going [sic] medical difficulties," (Dkt. #50 at 2), is not supported by any evidence in the record, and is not enough to give rise to an issue of fact.  *See Houston v. Zen Zen*, 388 F. Supp. 2d 172, 176 (W.D.N.Y. 2005) (conclusory allegations are insufficient to defeat summary judgment motion).

## C.  Claim Against C.O. Riddle

The basis for plaintiff's Eighth Amendment claim against C.O. Riddle is that Riddle was deliberately indifferent to plaintiff's medical needs by destroying plaintiff's sick-call-request forms

concerning prescription refills.  At his deposition, plaintiff testified that when he complained to C.O.

Pamela Copp (incorrectly identified by plaintiff as "Cox") that he was not receiving the appropriate

medical attention, she said that, referring to his sick call slips, "Officer Riddle's throwing your stuff

away." (Dkt. #42, Ex. A at 37.)

In her declaration in support of defendants' motion for summary judgment, Copp denies

making such a statement:

> At no time did I make any statements to inmate Bumpus about C.O. Riddle.  Additionally
> C.O. Riddle has always acted professionally in my presence during medical rounds.  At no
> time have I observed C.O. Riddle interfere with any exchange between medical staff and
> inmates.  Additionally, at no time did I observe C.O. Riddle destroying or discarding any
> inmates' sick call request forms.

(Dkt. #44 at 1-2.)

In addition to his own declaration in opposition to defendants' motion for summary

judgment, plaintiff has submitted a declaration of one Tyrone Murphy, an inmate who was housed

in the same unit as plaintiff at Elmira during May and June 2004.  (Dkt. #52 at 1.)  Murphy states

that he attempted to resolve plaintiff's problems in his capacity as Inmate Liaison Committee

Representative for his cell block.  (Dkt. #52 ¶ 6.)  He claims that C.O. Copp also told him that Riddle

had been destroying plaintiff's sick-call request slips.  (Dkt. #52 at 3.)

Although plaintiff's and Murphy's declarations may give rise to factual issues about whether

Copp ever stated to plaintiff and Murphy that Riddle was destroying plaintiff's sick call requests and

whether Riddle was in fact doing so, these do not constitute *material* factual issues.[2]  Plaintiff fails

---

[2]Copp's alleged statements appear to be hearsay.  Fed. R. Evid. 801(c).  I need not decide
whether those statements would be admissible at trial, or whether plaintiff should be allowed to
rely on them in opposing defendants' motion for summary judgment, *see Sadki v. Suny College*
(continued...)

to provide sufficient evidence to meet the objective aspect of the "deliberate indifference" component of an Eighth Amendment claim which requires a sufficiently serious deprivation of the prisoner's constitutional rights. *Wilson v. Seiter,* 50 U.S. 294, 298-299 (1991).

Even assuming *arguendo* that Riddle did destroy some of plaintiff's sick-call requests, plaintiff's claim against him fails because it does not satisfy the objective prong of an Eighth Amendment violation.  Although plaintiff does not allege specifically the nature of the sick-call slips that Riddle was allegedly discarding, it appears that they were prescription refill requests, and that this claim relates to the same alleged delay in obtaining refills for hypertension medication that forms the basis of plaintiff's claim regarding Dr. Canfield.   Plaintiff testified that when he complained to C.O. Copp, he told her "I need my medication." (Dkt. #42 Ex. A at 38.)  He also stated that after he complained to Copp, "they put me back on one-on-one medication, so I didn't have to put no more sick call slips on the [cell] bars to get refills." *Id.*[3]

As explained with regard to plaintiff's claim against Dr. Canfield, there is no evidence in the record that the relatively brief interruption in plaintiff's receipt of medication caused any adverse effects whatsoever to his health, or that it put him at any significant risk of serious harm.  In addition, by plaintiff's own admission, his complaints were addressed promptly, for soon after he complained

---

[2](...continued)
*at Brockport*, 310 F.Supp.2d 506, 517 (W.D.N.Y. 2004) (a court deciding a motion for summary judgment can consider hearsay upon a showing that admissible evidence will be available at trial), since defendants are entitled to summary judgment in any event.

[3]Plaintiff explained that "one-on-one" medication meant would be automatically refilled, without the need for a refill request by plaintiff.  Dkt. #42 Ex. A at 32.

to Copp, plaintiff began receiving prescription refills without being required to submit a sick-call request.  (Dkt. #42, Ex. A at 38.)

As to the subjective aspect of the "deliberate indifference" component, plaintiff alleges that Copp told him that Riddle had been destroying his sick call slips because Riddle "d[id]n't like [plaintiff] talking to the nurses."  (Dkt. #42 Ex. A at 37.)  Even accepting this hearsay evidence, it fails to establish that Riddle knew of and disregarded an "excessive risk" to plaintiff's health and safety, *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), or that Riddle "intended wantonly to inflict pain."  *Wilson*, 501 U.S. at 298-99.  Plaintiff has not established that his need for hypertension medication was "so obvious that even a lay person would easily recognize the necessity" that he receive the medication.  *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004) (citing *Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 208 (1st Cir. 1990), *cert. denied*, 500 U.S. 951 (1991), and *Smith*, 316 F. 3d at 187).  Accordingly, plaintiff's claim is dismissed as to Officer Riddle.[4]


**D.  Claim Against C.O. Scott**

Plaintiff alleges that Scott was deliberately indifferent to his medical needs by interfering with plaintiff's attempts "to get medical interpretation from a health care provider."  (Dkt. #1 at 5.) In response to one of plaintiff's family members' request for plaintiff's medical records, Dr. Canfield wrote plaintiff a letter instructing him about the proper waiver that was necessary, and informing

---

[4]In paragraph 33 of the complaint, plaintiff alleges that Riddle denied him access to the courts.  The complaint, however, contains nothing more than this conclusory allegation and the record is completely devoid of factual support for this allegation.  This claim is dismissed as well.

plaintiff that he had been scheduled for a urinalysis.  Plaintiff alleges that while a nurse was helping

him understand Canfield's letter, Scott came by and "snatched the paper out of [plaintiff's] hand and

balled it up ... ."  (Dkt. #42, Ex. A at 40.)

This action does not rise to the level of a constitutional deprivation.  Plaintiff did not suffer

any harm as a result of the alleged action, as he received the urinalysis as scheduled, and he was able

to release his medical information to his sister.  (Dkt. #42, Ex. A at 41.)  Accordingly, this claim

against Scott is dismissed.  This alleged act by Scott simply does not constitute deliberate

indifference to a serious medical need.

Additionally, plaintiff claims that Scott refused to inform the medical department that

plaintiff needed medical attention.  Plaintiff alleges that sometime on October 14, 2004, he began

feeling lightheaded, and that he believed that his blood pressure was high.  As Scott came by making

his rounds, plaintiff told Scott that he needed an emergency sick call.  Dkt. #42 Ex. A at 57.  Scott

said "all right," but did not return for some time.  When he came by again, Scott told plaintiff that

he had spoken to a certain nurse, and that the nurse had told Scott to "put [plaintiff] down for a sick

call in the morning."  *Id.*

Plaintiff did see a nurse the next morning.  *Id.* at 59.  Later that day, he also saw the nurse

to whom Scott said he had spoken, and the nurse told plaintiff that she had not been on duty the night

before, and had not seen Scott.  Plaintiff alleges that Scott never told any medical personnel about

plaintiff's sick call request.

Viewing the facts in the light most favorable to the plaintiff, Scott at most caused a delay of

less than a day before plaintiff was seen by a member of the medical staff.  The record is also devoid

of evidence that plaintiff's condition was such that it would have been obvious even to a layperson that plaintiff needed immediate medical attention, or that the alleged delay caused a significant threat of serious harm. *Blackmore*, 390 F.3d at 899; *Smith*, 316 F.3d at 186. Plaintiff's claim against Scott is therefore dismissed.

## IV. First Amendment Retaliation Claim Against Sergeant Ballachino

Plaintiff claims that Ballachino violated his constitutional rights by taking action against plaintiff in retaliation for plaintiff's having written letters and his filing of grievances against guards and other prison officials.

In order to establish a First Amendment retaliation claim, plaintiff must show (1) that he engaged in constitutionally protected speech or conduct, (2) that the defendants took adverse action against him, and (3) that there was a causal connection between the protected activity and the adverse action. *Dawes v. Walker*, 239 F.3d 489, 492 (2[d] Cir. 2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). The Second Circuit has admonished district courts to approach prisoner retaliation claims "with skepticism and particular care," because "virtually any adverse action taken against a prisoner by a prison official–even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes*, 239 F.3d at 491.

Applying these principles, I find that Ballachino is entitled to summary judgment. Although it is undisputed that plaintiff's filing of grievances constituted protected conduct, *see Graham v. Henderson*, 89 F.3d 75, 80 (2[d] Cir.1996); *Franco v. Kelly*, 854 F.2d 584, 590 (2[d] Cir.1988), plaintiff

has failed to adduce sufficient evidence to give rise to an issue of fact as to the "adverse action" prong of the test set forth in *Dawes*.

Adverse action, defined objectively, is "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2$^d$ Cir. 2004) (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2$^d$ Cir. 2003)). In that regard, the Second Circuit has observed that "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." *Dawes*, 239 F.3d at 491 (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir.1999) (en banc) (per curiam)). If a retaliatory act against an inmate would not be likely to "chill a person of ordinary firmness from continuing to engage" in a protected activity, "the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes*, 239 F.3d at 493.

Here, plaintiff alleges that Ballachino demanded that plaintiff not write to the Program Deputy again, and insisted that plaintiff report his complaints directly to Ballachino. Plaintiff also alleges that Ballachino caused plaintiff's cell to be searched, and plaintiff to submit to a urine test, in retaliation for plaintiff's complaints.

Under some circumstances, verbal threats may constitute adverse action, depending on their degree of specificity and the context in which they are uttered. *See, e.g.*, *Hepworth v. Suffolk County*, No. 2:02-cv-6473, 2006 WL 2844408, at *8-9 (E.D.N.Y Sept. 29, 2006) (denying summary judgment where "continued verbal threats" that inmate "would receive another beating or be killed" was sufficient "evidence ... such that a reasonable jury could find that the officers unconstitutionally

retaliated against [inmate] ... for exercising his First Amendment" rights).  Thus, vague intimations of some unspecified harm generally will not rise to the level of adverse action for the purpose of a First Amendment retaliation claim.  *See, e.g., Bartley v. Collins*, No. 95 Civ. 10616, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) (stating that "verbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action") (citing *Dawes*, 239 F.3d at 493, for the proposition that "[n]ot every unnecessary statement of a prison guard regarding an inmate's exercise of free speech violates the First Amendment"); *Alicea v. Howell*, 387 F. Supp. 2d 227, 237 (W.D.N.Y. 2005) (defendant's "alleged statements to plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance against [defendant] d[id] not give rise to a First Amendment retaliation claim"); *Cruz v. Hillman*, No. 01 Civ. 4169, 2002 WL 31045864, at *7 (S.D.N.Y. May 16, 2002) (allegation that defendant made statement which "expressed his dislike for inmates who file civil lawsuits, and later came to plaintiff's cell and said 'Green Haven is an open battlefield, so be careful'" was insufficient to state retaliation claim).

In the instant case, Plaintiff alleges that Ballachino "started trying to chastise me about writing to [Program Deputy], and he said he was getting tired of me writing his officers up ... it seems like all you want to do is write grievances."  (Dkt. #42, Ex. A at 53.)  Those alleged statements do not nearly approach the level of a specificity or concrete harm required to support a First Amendment retaliation claim.

As for plaintiff's allegation concerning the retaliatory cell search, the Supreme Court has stated that inmates have no constitutional protection from cell searches, even those conducted for

retaliatory reasons.  *Hudson v. Palmer*, 468 U.S. 517, 530 (1984); *see also Lashley v. Wakefield*, 367 F. Supp. 2d 461, 470 (W.D.N.Y. 2005).  It is well-settled, then, that plaintiff cannot base a retaliation claim against defendant Ballachino based on a cell search.  *Salahuddin v. Mead*, No. 95 Civ. 8581, 2002 WL 1968329, *5 (S.D.N.Y. Aug. 26, 2002) (dismissing First Amendment retaliation claim based on cell searches).

With respect to the allegedly retaliatory urine test, I am not convinced that plaintiff has established a causal connection between the test and plaintiff's constitutionally protected activity, or that this one urine test constituted adverse action sufficient to support a First Amendment claim. Plaintiff's allegation that the test constituted "harassment because I don't do drugs," (Dkt. #42, Ex. A at 55), fails to establish that the test was not administered for a legitimate purpose, or that there was a nexus between the test and plaintiff's protected activity.  Plaintiff does not allege that Ballachino ordered or administered the test, *see Brown v. Goord*, No. 9:04-CV-0785, 2007 WL 607396, *15 (N.D.N.Y. Feb. 20, 2007), nor does he establish any close the temporal proximity between the filing of a grievance by plaintiff and the alleged retaliatory act, *Colon v. Coughlin*, 58 F.3d 865, 872-73 (2d Cir. 1995).

Even if plaintiff had sufficiently established such a nexus, however, it bears repeating that "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." *Dawes*, 239 F.3d at 491.  Urine tests are a fact of prison life, *see Green v. Berge*, 354 F.3d 675, 679 (7th Cir. 2004) ("Testing prisoners' blood, urine, saliva, or hair for drugs is routine and does not require individual suspicion") (Easterbrook, J., concurring), and I do not find that one urine test would chill a prisoner of ordinary firmness from filing grievances.  This act is therefore "simply *de minimis* and therefore outside the ambit of constitutional protection."  *Dawes*, 239 F.3d at 493.

- 17 -

**V. Claim Against C.O. Materne**

Plaintiff alleges that Materne violated his constitutional rights through deliberately denying him access to the IGRC.  More specifically, plaintiff claims that Matterne delayed the processing of his grievances by failing to code his grievances properly.  (Dkt. #1 at 7-9.)  This claim must be dismissed.

The refusal to process an inmate's grievance, or failure to see to it that grievances are properly processed, does not give rise to a claim under § 1983.  *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991).  *See also Buckley v. Barlow*, 997 F.2d 494, 495-96 (8th Cir. 1993) (complaint failed to state a claim under § 1983 because no constitutional right was violated by the prison officials' failure to process prisoner's grievances); *Shell v. Brzezniak*, 365 F. Supp. 2d 362, 370 (W.D.N.Y. 2005) (prisoner's allegation that DOCS officials violated his First Amendment rights by failing to file and process his grievances failed to state a claim under § 1983).  Plaintiff's claim that Materne violated his constitutional rights by deliberately delaying the processing of his grievances is without merit and is therefore dismissed.

**VI.  Claims Against Defendants in their Official Capacity**

Although all of plaintiff's claims must be dismissed on the merits, I also note that, to the extent that plaintiff's claims are asserted against defendants in their official capacities, the claims are also subject to dismissal on the ground that they are barred by the Eleventh Amendment.

The Eleventh Amendment bars lawsuits by citizens against a state unless the state has waived its sovereign immunity.  *Seminole Tribe of Florida v. Florida,* 517 U.S. 44 (1996). "Although a case may arise under the Constitution and laws of the United States, the judicial power does not extend

to it if the suit is sought to be prosecuted against a State, without her consent, by one of her own citizens." *Id.* at 68.  Similarly, the Second Circuit has noted that "the Eleventh Amendment has been interpreted to render states absolutely immune from suit in federal court unless they have consented to be sued in that forum or unless Congress has overridden that immunity by statute." *National Foods, Inc. v. Rubin*, 936 F.2d 656, 658-59 (2$^d$ Cir.1991).  This immunity extends to state agencies, state branches of government, and other arms of the state unless the state has consented to suit or Congress has properly overridden the state's immunity. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).

DOCS, a state agency, enjoys Eleventh Amendment immunity from suit in federal court. *Delgado v. New York City Dep't of Corr.*, No. 90Civ.0663(VLB) 1992 U.S. Dist, LEXIS 13989, at * 4 (S.D.N.Y. Mar. 30, 1992).  In addition, claims against state officials in their official capacities are considered to be claims against the state, and therefore, "[t]he Eleventh Amendment bars recovery against an employee who is sued in his official capacity." *Farid v. Smith*, 850 F.2d 917, 921 (2$^d$ Cir. 1988).  Plaintiff's claims against defendants in their official capacities are therefore barred by the Eleventh Amendment and must be dismissed.


### CONCLUSION


Defendants' motion for summary judgment (Dkt. #40) is granted, and the complaint is dismissed.  Plaintiff's motion for appointment of counsel (Dkt. #49) is denied as moot.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       July 20, 2007.

- 19 -